NON-CONFIDENTIAL

2013-1323, -1331

_____

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
_____

LIFESTYLE ENTERPRISE, INC.,

Plaintiff-Appellee,

and

TRADE MASTERS OF TEXAS, INC.,
EMERALD HOME FURNISHINGS, LLC, and
RON'S WAREHOUSE FURNITURE
(doing business as Vineyard Furniture International LLC),

Plaintiffs,

and

DREAM ROOMS FURNITURE (SHANGHAI) CO., LTD.,

Plaintiff,

and

ORIENT INTERNATIONAL HOLDING SHANGHAI FOREIGN TRADE CO.,
LTD.,

Plaintiff,

and

GUANGDONG YIHUA TIMBER INDUSTRY CO., LTD.,

Plaintiff-Appellant,

v.

21374329

UNITED STATES and DEPARTMENT OF COMMERCE,

Defendants-Appellees,

and

AMERICAN FURNITURE MANUFACTURERS COMMITTEE FOR LEGAL TRADE and VAUGHAN-BASSETT FURNITURE COMPANY, INC.,

Defendants-Cross Appellants.

---

Appeals from the United States Court of International Trade in consolidated case no. 09-CV-0378, Judge Jane A. Restani.

---

## BRIEF OF DEFENDANTS-CROSS APPELLANTS, AMERICAN FURNITURE MANUFACTURERS COMMITTEE FOR LEGAL TRADE AND VAUGHAN-BASSETT FURNITURE COMPANY, INC.

Joseph W. Dorn
J. Michael Taylor
Daniel L. Schneiderman

KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 737-0500

*Counsel American Furniture Manufacturers Committee for Legal Trade and Vaughan-Bassett Furniture Company, Inc.*

August 5, 2013

21374329

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

LIFESTYLE ENTERPRISE, INC. V US
2013-1323, -1331

<u>Certificate of Interest</u>

Counsel for Defendants-Cross Appellants, American Furniture Manufacturers Committee for Legal Trade and Vaughan-Bassett Furniture Company, Inc., certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

<u>American Furniture Manufacturers Committee for Legal Trade (see attached) and Vaughan-Bassett Furniture Company, Inc.</u>

2.      The name of the real party in interest  (if the party named in the caption is not the real party in interest) represented by me is:

<u>Same</u>

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

<u>See attached.</u>

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

<u>King & Spalding - Joseph W. Dorn, J. Michael Taylor, Daniel L. Schneiderman, and P. Lee Smith.   Steven R. Keener (formerly of King & Spalding) also appeared at the Court of International Trade.</u>

<u>August 5, 2013</u>                          <u>*/s/ J. Michael Taylor*</u>
Date                                         J. Michael Taylor

**American Furniture Manufacturers Committee for Legal Trade**

Carolina Furniture Works, Inc.

Century Furniture Industries (owned by CV Industries, Inc.)

Harden Furniture, Inc.

Higdon Furniture Co., Inc.

Johnston/TomBigbee Furniture Manufacturing (owned by Lounoura Industries, Inc.)

Kincaid Furniture Co., Inc. (owned by La-Z-Boy, Inc., a public company)

L. & J.G. Stickley, Inc.

Lea Industries (owned by La-Z-Boy, Inc., a public company)

Michels & Company

MJ Wood Products, Inc.

Mobel, Inc.

Perdues, Inc.

Sandberg Furniture Mfg. Co., Inc.

Stanley Furniture Company, Inc. (public company)

T. Copeland & Sons

Tom Seely Furniture (TSF LLC) (owned by Caperton Furniture Works LLC)

Vaughan-Bassett Furniture Company Inc.

Vermont Tubbs (owned by Vermont Quality Wood Products LLC)

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………………………………...........iii

STATEMENT OF RELATED CASES ................................................................1

JURISDICTIONAL STATEMENT ....................................................................1

STATEMENT OF THE ISSUES.........................................................................1

STATEMENT OF THE CASE.............................................................................2

STATEMENT OF THE FACTS ..........................................................................4

I.    VALUATION OF LUMBER ......................................................................4

II.   FINANCIAL STATEMENTS OF DIRETSO DESIGN ...............................8

SUMMARY OF ARGUMENT ..........................................................................10

ARGUMENT .....................................................................................................12

I.    STANDARD OF REVIEW .......................................................................12

II.   THE TRADE COURT CORRECTLY FOUND THAT
      SUBSTANTIAL EVIDENCE DID NOT SUPPORT COMMERCE'S
      INITIAL FINDING THAT WEIGHT-BASED IMPORT DATA
      WERE THE BEST AVAILABLE INFORMATION FOR VALUING
      LUMBER ..................................................................................................13

      A.    Contrary To Yihua's Assertion, Commerce Did Not Find That
            The NSO Volume Data Were Unreliable For Valuing Lumber
            Because Of A "Standard Conversion Factor" .....................................13

      B.    Contrary To Yihua's Assertion, Weight-Based Surrogate
            Values Are Distorted By Differences In Moisture Content................18

      C.    Contrary To Yihua's Assertion, The *First Redetermination*
            Failed To Show That Species Mix Distorts Volume-Based
            Surrogate Values Rather Than Weight-Based Surrogate Values .......23

      D.    Yihua Fails To Explain Why The *First Redetermination* Is
            Supported By Substantial Evidence When Commerce Never

Addressed The Distortion Caused To Weight Data By The
Inclusion Of Packaging Weights ........................................................... 32

E.    Contrary To Yihua's Assertion, The Trade Court Did Not
Improperly "Re-Weigh" The Evidence Of Distortion ....................... 34

F.    Yihua Wrongly Suggests That The Trade Court Should Have
Upheld Use Of WTA Weight Data To Provide "Consistency" .......... 36

III.   THE TRADE COURT CORRECTLY UPHELD COMMERCE'S
DECISION NOT TO VALUE LUMBER USING THE
ALTERNATIVE SOURCES OF SURROGATE VALUES
PROPOSED BY YIHUA ............................................................................ 37

A.    Yihua Waived Any Argument To Value Lumber Using
Information Other Than Philippine Import Data ................................ 37

B.    Alternatively, Commerce's Finding On The Merits That The
Philippine Import Data Are Superior To Yihua's Proposed
Alternative Sources Is Supported By Substantial Evidence .............. 42

IV.   THE TRADE COURT ABUSED ITS DISCRETION BY FAILING
TO APPLY THE EXHAUSTION REQUIREMENT TO YIHUA'S
ARGUMENT AGAINST THE USE OF DIRETSO'S FINANCIAL
STATEMENTS ........................................................................................... 44

V.    THE TRADE COURT ERRED WHEN FINDING THAT
COMMERCE'S DECISION NOT TO USE DIRETSO'S
FINANCIAL STATEMENTS IN THE *FIRST REDETERMINATION*
WAS SUPPORTED BY SUBSTANTIAL EVIDENCE .............................. 51

CONCLUSION ...................................................................................................... 57

## CONFIDENTIAL MATERIAL OMITTED

Pursuant to Federal Circuit Rule 28(d)(1)(B), confidential business proprietary
information has been deleted from this brief. The redacted information was
designated as confidential business proprietary information by Guangdong Yihua
Timber Industry, Ltd. in submissions to the U.S. Department of Commerce and the
Court of International Trade.  The confidential business proprietary information
that has been redacted on pages 6-7, 18-19, 21-22, 24, 29 and 41 concerns
information relating to Yihua's production process.

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Chiu v. United States*,
948 F.2d 711 (Fed. Cir. 1991) ....................................................12, 50

*Corus Staal BV v. United States*,
502 F.3d 1370 (Fed. Cir. 2007) .................................................12, 50

*Essar Steel Ltd. v. United States*,
678 F.3d 1268 (Fed. Cir. 2012) ..........................................................12

*Home Prods. Int'l, Inc. v. United States*,
837 F. Supp. 2d 1294 (Ct. Int'l Trade 2012) ......................................39

*KYD, Inc. v. United States*,
836 F. Supp. 2d 1410 (Ct. Int'l Trade 2012),
*aff'd,* 2013 WL 2321890 (Fed. Cir. May 29, 2013) ...........................39

*Lifestyle Enterprise, Inc. v. United States*,
768 F. Supp. 2d 1286 (Ct. Int'l Trade 2011) ..............................passim

*Lifestyle Enterprise, Inc. v. United States*,
844 F. Supp. 2d 1283 (Ct. Int'l Trade 2012) ..............................passim

*Lifestyle Enterprise, Inc. v. United States*,
865 F. Supp. 2d 1284 (Ct. Int'l Trade 2012) ..............................passim

*Lifestyle Enterprise, Inc. v. United States*,
896 F. Supp. 2d 1297 (Ct. Int'l Trade 2013) ........................................4

*Ningbo Dafa Chem. Fiber Co. v. United States*,
580 F.3d 1247 (Fed. Cir. 2009) ..........................................................12

*Nippon Steel Corp. v. U.S.*,
458 F.3d 1345 (Fed. Cir. 2006) ..........................................................56

*Novosteel SA v. United States*,
284 F.3d 1261 (Fed. Cir. 2002) ..........................................................39

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i)..................................................................12

19 U.S.C. § 1677b(c) .......................................................................5, 8

19 U.S.C. § 1677b(c)(1)..............................................................10, 36

28 U.S.C. § 1295(a)(5)..........................................................................1

28 U.S.C. § 2637(d) .........................................................................50

**AGENCY DETERMINATIONS**

*Persulfates from the People's Republic of China*,
  68 Fed. Reg. 68030 (Dep't of Commerce Dec. 5, 2003)...................54

*Wooden Bedroom Furniture From The People's Republic of China*,
  74 Fed. Reg. 6372 (Dep't. of Commerce Feb. 9, 2009) ......................7

*Wooden Bedroom Furniture from the People's Republic of China*,
  74 Fed. Reg. 41374 (Dep't of Commerce Aug. 17, 2009) ........................passim

*Wooden Bedroom Furniture from China*,
  75 Fed. Reg. 5952 (Dep't of Commerce Feb. 5, 2010) ......................37

## STATEMENT OF RELATED CASES

In accordance with Rule 47.5 of the U.S. Court of Appeals for the Federal Circuit, counsel for Defendants-Cross Appellants American Furniture Manufacturers Committee for Legal Trade and Vaughn-Bassett Furniture Company, Inc. (collectively the "AFMC") states that no other appeal in or from this civil action in the lower court was previously before this or any other appellate court, nor is any case known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

This appeal is from a final judgment of the U.S. Court of International Trade ("Trade Court") entered on February 5, 2013. Defendants-Cross Appellants timely filed in the Trade Court a notice of appeal on April 16, 2013. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1295(a)(5).

## STATEMENT OF THE ISSUES

The appeal by Plaintiff-Appellant Guangdong Yihua Timber Industry Co., Ltd. ("Yihua") concerns the surrogate value for lumber used to calculate Yihua's dumping margin. The issues presented by Yihua's appeal are (1) whether the Trade Court properly remanded after finding that the "weight-based" surrogate value initially selected by the Department of Commerce ("Commerce") was unsupported by substantial record evidence, or (2) alternatively, whether the Trade Court and Commerce properly identified the surrogate data sources that Commerce

evaluated on remand when Yihua had waived its arguments concerning the use of information other than import data. *See* Corrected Brief of Plaintiff-Appellant Guangdong Yihua Timber Industry Co., Ltd. (July 16, 2013) ("*Yihua Br.*").

The AFMC's cross-appeal addresses whether the financial statements of the Philippine company Diretso Design Furniture, Inc. ("Diretso Design") should have been used in the surrogate financial ratios calculated for Yihua. The issues presented in the cross-appeal are (1) whether the Trade Court erred in finding that Yihua had preserved an argument against the use of those financial statements in Commerce's original final results, and (2) whether Commerce's decision on remand to discontinue using the Diretso Design financial statements was supported by substantial evidence.

## STATEMENT OF THE CASE

This case involves the third administrative review of the antidumping duty order on wooden bedroom furniture from China, which covered entries during calendar year 2007. *Wooden Bedroom Furniture from the People's Republic of China*, 74 Fed. Reg. 41374 (Dep't of Commerce Aug. 17, 2009) ("*Final Results*") and *Issues & Decision Memorandum for the Final Results* ("*IDM*") (JA-5230-5318). In the *Final Results*, Commerce (1) valued Yihua's lumber factors of production using Philippine import data stated on a value per-kilogram basis (rather than a value per-cubic meter basis) (JA-5237-5238) and (2) included the

financial statements of Diretso Design when calculating the surrogate financial ratios (JA-5272).  On February 11, 2011, the Trade Court remanded on both issues. *Lifestyle Enterprise, Inc. v. United States*, 768 F. Supp. 2d 1286 (Ct. Int'l Trade 2011) ("*Lifestyle I*").  It found that Commerce lacked substantial evidence to support its finding that the weight-based import data were superior to the volume-based import data for valuing lumber, *id*. at 1301-1302 (JA-74-77), and that Commerce failed to address Yihua's argument that the website www.diretso.com, upon which Commerce relied to show that Diretso Design produced wooden furniture, related to a different company.  *Id*. at 1308 (JA-87-89).

On August 26, 2011, Commerce issued a redetermination in which it discontinued using the financial statements of Diretso Design and continued to value lumber inputs using weight-based import data.  *Final Results of Redetermination Pursuant to Remand* (Aug. 26, 2011) ("*First Redetermination*") (JA-6011-6070).  On March 28, 2012, the Trade Court affirmed Commerce's rejection of the Diretso Design financial statements, but it held once again that Commerce's finding that weight-based import data were superior to volume-based import data when valuing lumber was unsupported by substantial evidence. *Lifestyle Enterprise, Inc. v. United States*, 844 F. Supp. 2d 1283, 1292-98 (Ct. Int'l Trade 2012) ("*Lifestyle II*") (JA-43-55).

On June 11, 2012, Commerce issued a second redetermination in which it valued Yihua's lumber inputs using volume-based import data. *Final Results of Redetermination Pursuant to Second Remand* (June 11, 2012) ("*Second Redetermination*") (JA-6336-6353). On September 7, 2012, the Trade Court affirmed the revised lumber valuation, but remanded on a separate issue (*i.e.*, corroboration of an adverse facts available rate for another exporter) that is not a subject of these appeals. *Lifestyle Enterprise, Inc. v. United States*, 865 F. Supp. 2d 1284 (Ct. Int'l Trade 2012) ("*Lifestyle III*"). The Trade Court's final opinion and judgment was entered on February 5, 2013. *Lifestyle Enterprise, Inc. v. United States*, 896 F. Supp. 2d 1297 (Ct. Int'l Trade 2013). These appeals ensued.

STATEMENT OF THE FACTS

## I.    VALUATION OF LUMBER

Yihua maintains its normal inventory records and reports consumption of wood inputs in its factors of production ("FOP") database on a volume (*i.e.*, cubic meter) basis. Yihua's Section D Response (Oct. 15, 2008) at Exhibits D-1 and D-11 to D-14 (JA-524, 770-867). No party contested the manner of Yihua's reporting, because to make a piece of furniture Yihua needs a particular *volume* of wood. *See id*. at Exhibit D-12 (JA-808-846) (showing that Yihua consumes a given volume of wood, calculated from the number and dimensions of wood boards used to make the finished product). Yihua does not need a particular *weight*

of wood to make the finished product.  *See Lifestyle II*, 844 F. Supp. 2d at 1294

(JA-47-48).

Surrogate values for lumber are based on Philippine import data.[1]  The

Philippine National Statistics Office ("NSO") is the exclusive agency that compiles

foreign trade statistics within the Philippines.  Petitioners' Post-Preliminary

Results Surrogate Values Submission (March 6, 2009) at Attachment 1, Exhibit 1

(JA-3927-3932).  For imports of lumber, the NSO reports import quantities on both

a *volume* basis (*i.e.*, cubic meters) and on a *weight* basis (*i.e.*, kilograms).  *Id*. at

Exhibit 2 (JA-3933-4033).  Select NSO import data also are republished in the

World Trade Atlas ("WTA"), a secondary source owned by Global Trade

Information Services, Inc. ("GTIS").  Surrogate Value Memorandum for the

Preliminary Results (Jan. 30, 2009) at 4 (JA-3026).[2]

---

[1]    Because China is a non-market economy, Commerce determines normal value by valuing the factors of production ("FOP") using the "best information available" regarding the value of those factors in a surrogate market-economy country.  19 U.S.C. § 1677b(c).

[2]    For lumber, the WTA republished import quantities on a weight basis but not on a volume basis.  Factor Valuation Memorandum for the Final Results (Aug. 10, 2009) at Attachment 2 (JA-996).  Throughout its opening brief, Yihua refers to import quantities stated on a weight basis as "WTA data" and import quantities stated on a volume basis as "NSO data."  *See, e.g., Yihua Br.* at 18.  This is misleading, because both sets of data are collected and published by the NSO.  (JA-1000).  Accordingly, this brief differentiates the datasets as "weight-based" or "volume-based" import quantities.

Commerce can calculate a surrogate value using import quantities stated on a volume basis, because Yihua's FOPs are also stated on a volume basis. To calculate a surrogate value using import quantities stated on a weight basis, however, Commerce must convert the resulting values per kilogram to values per cubic meter using a conversion factor based on the average density of the kiln-dried wood consumed by Yihua. This latter methodology is distortive to the extent that the density of the lumber consumed by Yihua is different from the density of the lumber imported into the Philippines used to derive a surrogate value.

The main lumber input consumed by Yihua has an average density of [    ] kilograms per cubic meter, which is [            ] the average density of the lumber imported into the Philippines, *i.e.*, 670 kilograms per cubic meter. *See* **Figure 1** on page 19. Consequently, whether Commerce uses a volume-based valuation or a weight-based valuation (and then converts to a volume number using Yihua's reported density) has a significant impact in this case. *See Lifestyle II,* 844 F. Supp. 2d at 1292 (JA-43-44). For a piece of furniture that requires Yihua to consume three cubic meters of lumber, for example, a volume-based approach would value that lumber based on the price of three cubic meters of lumber as imported into the Philippines. A weight-based approach would value that lumber based on the price of only about [    ] cubic meters of lumber imported into the Philippines, because [    ] cubic meters of the high-density lumber imported into

the Philippines weighs roughly the same as three cubic meters of the [          ]

lumber consumed by Yihua.  *See* **Figure 1** on page 19 (showing that the weight-

based unit value is roughly [          ] of the volume-based value).

   During the administrative review, Commerce valued lumber using the NSO

volume data in the preliminary results.  *Wooden Bedroom Furniture From The*

*People's Republic of China*, 74 Fed. Reg. 6372, 6383 (Dep't. of Commerce Feb. 9,

2009) (preliminary results) ("*Preliminary Results*") (JA-3593) ("We used import

values published by the Philippines NSO, which are available upon request from

the Philippines NSO, which were reported in U.S. dollars, contain import

quantities in cubic decimeters, and are contemporaneous with the POR to value the

following inputs: wood inputs (*e.g*., lumber of various species), wood veneer of

various species, and processed woods (*e.g*., plywood, etc.)").  Commerce explained

that "conversions of wood from a weight to a volume measurement are a concern

as the density of wood varies based on the moisture content of the wood" and that

use of volume data "avoid{s} the need to convert the Filipino quantity data from a

weight to a volume measurement."  Surrogate Country Selection Memorandum

(Jan. 30, 2009) at 12-13 (JA-3543-3544).

   Despite having made these observations, Commerce opted to use weight-

based data in the *Final Results*, finding that the NSO import data were unreliable in

their entirety (because of certain "anomalies" in the packing weight data reported

for certain non-lumber products).  *IDM* at 6 (JA-5235).  On remand, Commerce

abandoned its original justification for rejecting the NSO import data – and no

party has since argued that the findings in the original *Final Results* were correct.

Commerce made new findings on remand, however, that surrogate values

calculated using import weights were superior to those using import volumes.

*First Redetermination* at 8-15 (JA-6018-6025).  Because those new findings also

were unsupported by substantial evidence, Commerce properly used the volume

data in its *Second Redetermination*.  (JA-6339).

## II.     FINANCIAL STATEMENTS OF DIRETSO DESIGN

In the original *Final Results*, Commerce calculated surrogate financial ratios

using the financial statements of Diretso Design (among others), because it found

that Diretso Design was a Philippine producer of "comparable merchandise" to the

wooden bedroom furniture manufactured by Yihua.  *IDM* at 43 (JA-5272).[3]  This

finding was premised on "Diretso Design's online catalog," which had been

submitted by both Yihua and the AFMC.  *Id*., citing Yihua's Comments on

Petitioners' Surrogate Value Submission of March 6, 2009 (Mar. 16, 2009) at

Exhibit 1 (JA-4403-4462) and Petitioners' March 6, 2009 Post-Preliminary Results

-----

[3]     Because China is a non-market economy, Commerce determines the
amount of "general expenses and profit" included in normal value based on the
experience of producers of comparable merchandise in a surrogate market-
economy country.  19 U.S.C. § 1677b(c).

Surrogate Values Submission at Attachment 7 (JA-4252-4257). The "online catalog" submitted by both parties was from the website www.diretso.com. (JA-4404-4462 and JA-4252-4257). Yihua argued to Commerce that the www.diretso.com website showed that Diretso Designs made furniture from "abaca fibers," which it claimed was not "comparable merchandise." Yihua's Agency Case Brief (June 1, 2009) at 33-35 (JA-4559). Commerce, however, determined in the *Final Results* that the online catalog proved that Diretso Designs did, in fact, make comparable merchandise. *IDM* at 43 (JA-5272). The Trade Court confirmed in *Lifestyle I* that the information at www.diretso.com "constitute{d} substantial evidence that the company described therein produces comparable merchandise to respondent." *Lifestyle I,* 768 F. Supp. 2d at 1308 (JA-88).

Although this should have been the end of the litigation, it was not. On appeal, Yihua raised a new argument that challenged whether the www.diretso.com website even related to Diretso Design in the first place. This argument should have been procedurally barred, because it had not been made at the agency level. The Trade Court erroneously failed to apply the exhaustion doctrine, however, and remanded "so that Commerce may determine if the financial statements match the correct company." *Id*. In its *First Redetermination*, Commerce found that the companies did not "match," and it opted to discontinue

using the financial statements of Diretso Design. *First Redetermination* at 16-18 (JA-6026-6028). That decision was unsupported by substantial evidence, because the record conclusively demonstrates that the financial statements of Diretso Design are for the same company as that described in the website at www.diretso.com.

## SUMMARY OF ARGUMENT

Commerce failed in the *First Redetermination* to value Yihua's lumber inputs using the "best available information" as required by statute. 19 U.S.C. § 1677b(c)(1). Commerce was faced with a choice between two methods for valuing Yihua's wood inputs: (1) using weight-based import data or (2) using volume-based import data. The Trade Court correctly decided that the findings in the *First Redetermination* leading to Commerce's rejection of the volume-based data are unsupported by substantial evidence. The Trade Court observed that there was no evidence that the volume-based import data for lumber are distorted by the use of a "standard conversion factor." The Trade Court also properly observed that the record demonstrates that a weight-based approach is distorted by density differences between the lumber imported into the Philippines and the lumber consumed by Yihua, whether caused by differences in moisture content, species mix, or a combination of the two. Moreover, the Trade Court's observation that a weight-based approach is distorted by the inclusion of packaging materials is not

<u>even being challenged by Yihua</u>.  There was no basis, therefore, for Commerce to conclude that a weight-based approach is superior to a volume-based approach, or that it represents the "best available information" by which to value lumber.  Thus, the Trade Court correctly remanded the matter in *Lifestyle II*, because Commerce's *First Redetermination* findings were unsupported by substantial record evidence.  Commerce correctly employed a volume-based valuation in the *Second Redetermination*.  In addition, the Trade Court appropriately ruled that Yihua had failed to preserve new arguments asserted after the *Second Redetermination* for alternative (*i.e.*, non-import based) lumber surrogate values.

With respect to the financial statements of Diretso Design, the Trade Court erred in finding that Yihua had preserved its argument against the use of those financial statements.  It is correct that Commerce did not address in its *Final Results* the argument that the website www.diretso.com does not relate to Diretso Design.  Commerce did not do so, however, because Yihua never made that argument during the underlying review.  The Trade Court's finding to the contrary was wrong, and it should have affirmed this aspect of the *Final Results* without remanding for additional consideration.  Moreover, Commerce's finding in the *First Redetermination* that the audited financial statements of Diretso Designs do not correspond to the company described at the website www.diretso.com is unsupported by substantial evidence.

11

# ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews Commerce decisions *de novo*, applying the same standard of review as the Trade Court.  Commerce's determinations should be upheld unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1272 (Fed. Cir. 2012).  Although the lower court's decision is reviewed *de novo*, the Court should give "great weight to" the Trade Court's "informed opinion," which should be "the starting point" of the Court's analysis.  *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1253 (Fed. Cir. 2009).

This Court reviews lower court decisions regarding exhaustion of administrative remedies under an abuse of discretion standard.  *See Corus Staal BV v. United States*, 502 F.3d 1370, 1381 (Fed. Cir. 2007).  A trial court abuses its discretion when it errs in interpreting the law, exercises its judgment on clearly erroneous findings of material fact, or irrationally weighs the relevant factors.  *See Chiu v. United States*, 948 F.2d 711, 713 (Fed. Cir. 1991).

II.    **THE TRADE COURT CORRECTLY FOUND THAT SUBSTANTIAL EVIDENCE DID NOT SUPPORT COMMERCE'S INITIAL FINDING THAT WEIGHT-BASED IMPORT DATA WERE THE BEST AVAILABLE INFORMATION FOR VALUING LUMBER**

A.    **Contrary To Yihua's Assertion, Commerce Did Not Find That The NSO Volume Data Were Unreliable For Valuing Lumber Because Of A "Standard Conversion Factor"**

Yihua's appeal relies on a series of false premises. Yihua first claims that the volume-based import quantities for lumber as reported by the NSO were distorted by a "standard conversion factor." *Yihua Br*. At 15, 22-24. In particular, Yihua claims that the NSO does not report "the actual volume," but rather derives a volume from actual weights using a "standard conversion factor." *Yihua Br*. at 15. According to Yihua, "{t}his conversion factor was necessary for the NSO data because wood imports into the Philippines are required to be reported on only a weight basis*, i.e.*, importers are not required to report a volume." *Id*.

Yihua also erroneously argues throughout its brief that Commerce's preference in the *First Redetermination* for valuing lumber using weight data was supported by substantial evidence, because the distortion to the volume data caused by this "standard conversion factor" outweighed any distortion to the weight data caused by density differences. According to Yihua,

> Here, Commerce carefully analyzed the NSO and the WTA data and found that they were imperfect, but that petitioners' complaints about the WTA data did not impeach that source to the same extent that the affirmative evidence that the NSO data were compiled

> using a standard conversion factor rather than actual
> volume, compromised the integrity of the NSO data.

*Id*. at 27.   Yihua states that "{i}t was permissible for Commerce to reject the

volume-based NSO data which it knew to be distorted because of the use of a

standard weight-to-volume conversion factor (without any ability to assess the

extent of the distortion) in favor of the weight-based WTA data which accurately

reflected the actual weight of the wood imports at issue." *Id*. at 24.  Yihua argues

that the Trade Court improperly "re-weighed" the evidence when it concluded that

any distortion to the volume-based approach (caused by the use of a "standard

conversion factor") was outweighed by the distortion to the weight-based approach

(caused by density differences).  *Id.* at 22-24.

Yihua's argument misreports both the underlying facts and Commerce's

findings with respect to those facts.  As an initial matter, it is misleading to claim

that "wood imports into the Philippines are required to be reported on only a

weight basis*, i.e.*, importers are not required to report a volume." *Cf. Yihua Br*. at

15.  The Philippines Bureau of Customs, which is the source of the NSO import

data, requires importers to report both the volume and weight of their lumber

entries on official entry documents. *See* Petitioners' Supplemental Submission of

Surrogate Values (Dec. 30, 2008) at Attachment 2, para. 8 (JA-1000).  In this case,

Commerce merely found that although importers are required to report volume

data, they "sometimes but very seldom" fail to do so. *First Redetermination* at 41

(JA-6051). It is only in those very rare instances that Philippine customs officials estimate volume using a "standard conversion factor." *Id.*[4]

More importantly, Commerce made no finding that the NSO's use of a "standard conversion factor" distorted the import volume data for lumber, and it did not rely on this as a reason for preferring the weight-based data when valuing lumber. In the *First Redetermination*, Commerce found that "the use of standard conversions render the NSO volume-based database less reliable for purposes of valuing Yihua's <u>veneer and plywood</u> inputs than weight-based data." *First Redetermination* at 42 (JA-6052) (emphasis added).[5] Commerce did not, however, find that the use of a standard conversion factor rendered the NSO volume data

---

[4]    Although Commerce found that Philippine customs officials may derive missing volumes from reported weights, it is equally probable that those officials also derive missing weights from reported volumes. *See* AFMC's Comments Concerning Commerce's Final Results of Redetermination Pursuant To Remand (Oct. 6, 2011) (JA-6146-6149). That being the case, any distortion from the use of a "standard conversion factor" would affect both the volume and weight data and would provide no reason to prefer the weight data over the volume data. *Id.* This point is ultimately irrelevant, however, because (as explained below) the import data for the lumber subheadings at issue in this appeal did not reflect any significant usage of a "standard conversion factor" to derive either quantity field.

[5]    No party challenged this finding or Commerce's decision to value veneer and plywood using weight-based import data in the *Second Redetermination. See Second Redetermination* at n.21 (JA-6342). Commerce's valuation of veneer and plywood is not, therefore, the subject of this appeal. Instead, this appeal concerns Commerce's valuation of poplar, ash, and pine <u>lumber</u> as reflected in the FOP variables "LPOPLAR_SV," "LASH_SV," and "LPINE_SV." (JA-6074).

less reliable for purposes of valuing Yihua's <u>lumber inputs</u> (which are the subject of this appeal). To the contrary, Commerce stated that "{w}ith regard to the other wood inputs, the application of the standard conversion of 0.848 to the inputs of ash, poplar and pine {lumber} appears to be minimal." *Id.*[6] That is, Commerce agreed with comments from the AFMC showing that the factor affected less than one percent of the imported lumber quantity. *See* Petitioners' Comments Concerning Draft Results Of Redetermination (June 13, 2011) at 4-5 (JA-5704-5705).[7] The Trade Court agreed, stating:

> Given Commerce's agreement that the standard conversion
> ratio is demonstrated to be distortive of only a very small
> amount of the volume data (apparently about 1%), and the fact
> that the transactions affected by the standard conversion ratio
> may even be removed, the mere presence of a standard ratio

---

[6] Yihua claims that the extent of the distortion might have been more widespread, and that certain entries using the standard conversion ratio could have been masked, through averaging, with other entries bearing actual data. *Yihua Br.* at 15-16. Commerce, however, did not reach this conclusion. *See First Redetermination* at 42 (Commerce "cannot determine whether, as Yihua argues, the standard conversion was applied to a significant portion of these inputs but masked by the concurrent application of specific conversions") (JA-6052). *See also Lifestyle II,* 844 F. Supp. 2d at 1296 n.26 (JA-51). Instead, as discussed in the text, Commerce on further review concluded that "it does not appear that the standard conversion was used extensively enough to distort the data." *Second Redetermination* at 13 (JA-6348).

[7] The AFMC also demonstrated that removal from the calculation of those few entries affected by the "standard conversion factor" would have virtually no impact on the resulting surrogate values. AFMC's Comments Concerning Commerce's Final Results of Redetermination Pursuant To Remand (Oct. 6, 2011) at 6-8 (JA-6144-6146).

being used in some circumstances does not constitute
substantial evidence supporting the use of weight-based data.

*Lifestyle II*, 844 F. Supp. 2d at 1297-98 (JA-52-54).

When Yihua continued to dispute this point during the second remand
proceeding, Commerce stated even more definitively that it had "concluded that,
for these specific {lumber} inputs, it does not appear that the standard conversion
was used extensively enough to distort the data." *Second Redetermination* at 13
(JA-6348). According to Commerce, "we disagree with Yihua Timber's assertion
that the NSO {volume} data for the specific inputs of poplar, ash and pine wood
are flawed." *Id.*

Yihua's contention in this appeal that the Trade Court impermissibly "re-
weighed" the evidence regarding the potential distortion to lumber surrogate values
caused by the "standard conversion factor" is meritless, *see Yihua Br.* at 20-24,
because Commerce itself did not rely on this factor to support its use of weight-
based data in the *First Redetermination*. Commerce relied on other findings to
support the conclusion in its *First Redetermination* but, as explained below, the
Trade Court correctly found those other reasons to be unsupported by substantial
evidence.

**B.    Contrary To Yihua's Assertion, Weight-Based Surrogate Values Are Distorted By Differences In Moisture Content**

The use of weight-based import data creates distortions in the surrogate value calculations that do not exist with the use of volume-based import data. As stated above, Commerce correctly explained that "conversions of wood from a weight to a volume measurement are a concern as the density of wood varies based on the moisture content of the wood" and that use of volume data "avoid{s} the need to convert the Filipino quantity data from a weight to a volume measurement." Surrogate Country Selection Memorandum (Jan. 30, 2009) at 12-13 (JA-3543-3544). In the *First Redetermination*, however, Commerce overlooked that distortion.

For imports of the primary lumber category, which has an average density of 670 kg/m$^3$, the average unit value (on a volume basis) is $496 per cubic meter. *See* **Figure 1**, column 2. Applying Commerce's conversion factor (based on Yihua's reported density of [     ] kg/m$^3$), however, results in a surrogate value of $[     ] per cubic meter for Yihua's kiln-dried poplar. *See* **Figure 1**, column 1. It makes absolutely no sense that one cubic meter of kiln-dried poplar consumed by Yihua would be worth [   ] percent *less* than one cubic meter of high-moisture "green wood"[8] imported into the Philippines—*i.e.,* $496-$[     ] / $496 = [   ] percent.

---

[8]    "Green wood" is "freshly sawn wood." Petitioners' Submission of Pre-Preliminary Rebuttal Surrogate Values (Nov. 14, 2008) at Attachment 16, page



**Figure 1**
**Poplar Lumber - Range of Per Cubic Meter Values**

|  (1) | (2) | (3) |
|---|---|---|
| Weight | Volume | Additional Correction |
| Based | Based | For Value Added |
| Approach | Approach | At Drying Process* |
| *(Density Distortion)* | *(No Density Distortion)* | |

$[ \quad ]$                          \$496                          ?

| NSO Unit Value | $496/m³ | a = g |
| NSO Avg. Density | 670 kg/m³ | b |
| Yihua Avg. Density | [    ] kg/m³ | c |
| *First Redeterm. Surrogate value* | $[    ]/m³ | d=(a/b)*c |

| NSO Value | $ 62,437,082 | e |
| NSO Volume | 126,007 m³ | f |
| **NSO Unit Value** | **$496/m³** | g = e/f |

| NSO Unit Value | $496/m³ | h = g |
| Kiln Drying Cost | Unknown | i |
| Kiln Dried Unit Value | **Unknown** | j = h+i |

\* Any surrogate value calculated using import quantities stated on a weight basis or a volume basis will be understated to the extent that it excludes the additional costs for kiln-drying imported green wood to the dryness required for furniture production. This provides no reason, however, to prefer surrogate values calculated on a weight basis, which are understated to a demonstrably larger extent than surrogate values calculated on a volume basis. Because the volume data are understated to a far lesser extent than the weight data, they represent the "best available information."

Source: Analysis Memorandum for the First Redetermination (Aug. 26, 2011) at Attachment III (JA-6074 and JA-6081). Slight differences due to rounding.

The process of kiln-drying removes [    ] percent of the *weight* of one cubic meter of green wood by evaporation,[9] but it does not remove [    ] percent of the *value* of that cubic meter. To the contrary, kiln-drying adds value. Commerce achieved a distorted result in the *First Redetermination*, in essence, by allocating [    ] percent of the value of the green lumber to the *moisture* that evaporates away.

---

3-5 (JA-984.361). The moisture content for "green wood" poplar ranges from 83 percent to 106 percent. *Id*. at page 3-6 (JA-984.362). Kiln-dried lumber typically has a moisture content of between 10 percent and 20 percent, but wood for furniture may have a final moisture content in the range of 6 percent to 8 percent. *Id*. at page 12-12 (JA-984.492). Yihua consumes [                    ] kiln-dried lumber, with a moisture content of [    ] percent. *First Redetermination* at n. 36 (JA-6021); Yihua's Supplemental Questionnaire Response (Jan. 9, 2009) at 15 (JA-1438); Yihua's Supplemental Section D Questionnaire Response (Dec. 31, 2008) at 2 (JA-1173).

[9]    (670 kilograms per cubic meter – [    ] kilograms per cubic meter) / 670 kilograms per cubic meter = [    ] percent.

It is distortive to calculate a surrogate value for Yihua's kiln-dried lumber using Philippine import values stated on a dollars per kilogram basis, because it takes far more than one kilogram of the green wood lumber imported into the Philippines to derive (after the removal of moisture) one kilogram of kiln-dried lumber of the type consumed by Yihua. Comparing per-kilogram values of woods with different moisture contents is simply not an "apples-to-apples" comparison.

As the Court explained in *Lifestyle II*,

> Here, the record clearly demonstrates that the use of weight-based data understates the wood input surrogate value. Yihua Timber uses only low-moisture, kiln-dried wood, a very specific subset of the wood imported under the tariff heading. This type of wood should command a higher price per kilogram than the average wood imported under that tariff heading because it yields more cubic meters of wood per kilogram. The use of weight-based data in conjunction with a basket tariff heading, therefore, places an artificially low value on the wood used by Yihua Timber because the inclusion of higher-moisture content wood and wood that lacks the value added from the kiln-drying process depresses the surrogate value. Moreover, because wooden bedroom furniture requires a certain volume of wood, not a certain weight of wood, this distortion due to the presence of green wood imported under the tariff headings is only present when weight-based data are used.

*Lifestyle II*, 844 F. Supp. 2d at 1293-94 (JA-46-48).

On appeal, Yihua argues that it cannot be distortive to use the weight-based import data because any values stated on a dollars per kilogram basis can be converted back to dollars per cubic meter using Yihua's "verified" conversion

factor. *Yihua Br.* at 16, 25. According to Yihua, "Commerce verified the accuracy of Yihua's conversion factor from weight to volume, and thus, was satisfied that there would be no issue with converting the WTA data from weight to volume to value Yihua's wood inputs reported in volume." *Id.* at 16. Yihua claims that alone "should have been sufficient." *Id. See also id*. at 25 (arguing that the Trade Court found no error in the "*verified* conversion data" supplied by Yihua).

This argument, like the *First Redetermination*, simply <u>ignores</u> the distortion. Yes, Yihua provided a conversion factor based on the density of the lumber it consumed, *i.e.*, [      ] kilograms per cubic meter, *see* **Figure 1** above, and yes, this number has been "verified." But that does not mitigate the distortion, and it does not imply that there "would be no issue with converting the WTA data from weight to volume." *Yihua Br.* at 16. The problem was not with verifying the density of the lumber consumed by Yihua. The problem was that the density of the lumber consumed by Yihua was <u>different</u> from the density of the lumber imported into the Philippines. As explained above, using a weight-based methodology is distortive because the lumber consumed by Yihua was of a [          ] density than the lumber imported into the Philippines.

Although Yihua does not deny these density differences, Yihua claims they are not attributable to differences in moisture content. Yihua states that there "was no, *i.e.*, zero, evidence on the record to support those contentions" that the lumber

imported into the Philippines had a higher moisture content than the kiln-dried lumber it consumed. *Yihua Br.* at 16. That is simply wrong. In making furniture, Yihua consumes *only* kiln-dried lumber that has been dried to a [

] percent. *See* n. 8 above. The Philippine imports, because they represent a broad average of many different entries, must have, on average, a higher moisture content than the wood consumed by Yihua. In fact, Commerce itself found that the relatively high average density for the wood imported into the Philippines indicates that at least some portion of the imports is comprised of "green wood." *First Redetermination* at 12 ("As the Philippine lumber imports are an average density, there is some amount of wood covered above and below the average of 670 kilograms, indicating a mix of dried and green wood") (JA-6022). *See also Lifestyle II,* 844 F. Supp. 2d at 1293 n. 19 (JA-46) (the fact that "green wood" is included in the Philippine import data is in "the explicit language of the Remand Results") and n. 20 (given that Yihua's lumber is "dried to a [

] percent," it is "reasonable to assume that a majority of the lumber imported {into the Philippines} does not fit that description") (JA-46). In other words, the higher density of the Philippine imports is (at least in part) because those imports have, on average, a higher moisture content than the kiln-dried lumber consumed by Yihua.

Because the weight-based (but not a volume-based) valuation is distorted by differences in moisture content between the lumber imported into the Philippines and the lumber consumed by Yihua, and because Commerce failed to address and take such distortion into account in its *First Redetermination*, Commerce's finding that the weight-based data represented the "best available information" to value lumber was unsupported by substantial evidence. The Trade Court did not err by remanding the matter for further consideration.

### C. Contrary To Yihua's Assertion, The *First Redetermination* Failed To Show That Species Mix Distorts Volume-Based Surrogate Values Rather Than Weight-Based Surrogate Values

In the *First Redetermination*, Commerce found that "moisture content is not the only factor affecting weight," and some portion of the density differential may be explained by species mix. *First Redetermination* at 44-45 (JA-6054-6055). That is, different species have different densities on a dry basis, and some portion of the Philippine imports could have been comprised of such denser species. Commerce failed to provide an explanation supported by substantial evidence, however, as to how this tended to show that the weight-based import data were superior to the volume-based data.

The weight-based data are distortive whenever there is a difference in density between the lumber imported into the Philippine and the lumber consumed by Yihua, regardless of whether the difference is a result of differences in moisture

content, species mix, or a combination thereof.  Even if the density disparity were

*entirely* the result of species mix (which Commerce found not to be the case), the

same distortion persists.  Assume *arguendo* that all of the wood entering the

Philippines is kiln-dried to [     ] percent moisture content but is of a species that

is exactly twice as dense as that used by Yihua.  A volume-based methodology

would mean that for each cubic meter of wood consumed by Yihua, the surrogate

value would be the average price for one cubic meter of wood imported into the

Philippines.  A weight-based valuation would mean that for each cubic meter of

wood consumed by Yihua, the surrogate value would be the average price for *one-*

*half* of a cubic meter of wood imported into the Philippines (because that half

cubic meter weighs the same as the one cubic meter of wood consumed by Yihua).

Again, this makes no sense, because Yihua must consume a given volume of wood

(not a given weight of wood) in order to make a piece of furniture.  To the extent

that species mix may account for some portion of the density differential,

therefore, that fact does not justify Commerce's resort to a weight-based

methodology.

Commerce acknowledged that imports of "high-density woods" will

"significantly increase the {kilogram} denominator" of a weight-based surrogate

value calculation, thereby depressing the resulting unit value.  *First*

*Redetermination* at 45 (JA-6055).  Commerce also found, however, that imports of

such woods "will also significantly increase the numerator" because "species-specific densities roughly correlate to prices: the higher the species-specific density, the higher the price." *Id*. Commerce's finding of a correlation was unsupported, however, by substantial evidence. Moreover, even if there were such a correlation, Commerce failed to make the necessary findings regarding the *degree* of such correlation and its potential impact on surrogate values in such a way that would support the use of the weight-based dataset.

Yihua argues that the Trade Court erred because it should not have "re-weighed" the evidence of distortion caused by differences in moisture content against the distortion caused by differences in species mix. *Yihua Br*. at 20-21. What Yihua fails to appreciate, however, is that both phenomena distort the weight-based data, and thus they provide no basis to prefer the weight-based data over the volume-based data. In fact, there is only one way that differences in species mix would not distort a weight-based approach: if there is a perfect one-to-one correlation (*i.e.,* a correlation with a coefficient of 1.0) between price and density, such as where the density doubles, the price also doubles. Commerce made no such finding, nor is there any substantial evidence to support such a finding.

To the contrary, the record shows that there is no correlation in the first place. The *First Redetermination* cited no evidence for such a correlation other

than page 8 of Yihua's original June 1, 2009 agency case brief.  *First Redetermination* at n. 106 (JA-6055).  In its original brief, Yihua claimed that a "correlation" between price and density existed based on analysis of U.S. export data for certain species.  Yihua's Agency Br. (June 1, 2009) at 8 (JA-4533).  As the AFMC has previously demonstrated, because those export data are unreliable and represent a miniscule sample, they cannot generate any statistically significant correlations.  *See* AFMC's Comments Concerning Commerce's Final Results of Redetermination Pursuant To Remand (Oct. 6, 2011) at 19-20 (JA-6157-6158).  More importantly, however, the cited analysis at page 8 of Yihua's agency case brief was biased, because it included information for only four of the seven species for which both price and density data were available.  Yihua's Agency Br. (June 1, 2009) at 8 (JA-4533) (showing both densities and export prices for poplar, ash, hard maple, and white oak).  Yihua conveniently omitted from its analysis density information for red alder, cherry, and walnut species that undermine its purported "correlation."  *Id*.

The analysis in **Figure 2**, below, includes all of the data available on the record for *every species* for which there existed both (1) species-specific U.S. export prices and (2) species-specific densities.  As shown in **Figure 2**, although cherry and walnut species have by far the highest per-cubic meter values, they have much lower densities than ash, maple, and white oak.  In addition, although

poplar and red alder have roughly the same density, red alder is significantly more

expensive.  Moreover, hard maple has a higher value than white oak, despite the

fact that it has a lower density.  An analysis of the complete set of export data

provided by Yihua confirms, therefore, that there is <u>no correlation between density</u>

<u>and unit value</u>.  This should be unsurprising, as the relative values of individual

species of woods are determined by many factors, such as appearance, fashion,

scarcity of supply, mechanical properties, *etc*.  Yihua's analysis, and consequently

Commerce's analysis, makes no attempt to control for any of these factors.

**Figure 2**

| Species | Specific Gravity | Moisture Content | Density | Export Value | Source For Density Information* |
|---|---|---|---|---|---|
| Poplar | 0.42 | 12 | 449 | $  333 | American Hardwood Export Council |
| Red Alder | 0.41 | 12 | 459 | $  441 | Wood Handbook at pages 3-13 and 4-9. |
| Cherry | 0.50 | 12 | 560 | $1,364 | Wood Handbook at pages 3-13 and 4-4. |
| Walnut | 0.55 | 12 | 616 | $1,394 | Wood Handbook at pages 3-13 and 4-6. |
| Ash | 0.60 | 12 | 673 | $  522 | American Hardwood Export Council |
| Hard Maple | 0.63 | 12 | 705 | $  758 | American Hardwood Export Council |
| White Oak | 0.68 | 12 | 769 | $  679 | American Hardwood Export Council |

* Petitioners' Rebuttal Surrogate Values Submission (Nov. 14, 2008) at Attachment 16 (Wood Handbook)
(JA-984.369, 984.385, 984.387, 984.390); Yihua's Surrogate Values Submission (March 6, 2009) at Exhibit
13 (American Hardwood Export Council) (JA-3684-3693).  *See also*  JA-4533.

The analysis of the complete set of data in **Figure 2** stands in sharp contrast

to the analysis at page 8 of Yihua's agency case brief, which omits information

regarding cherry, walnut, and red alder species.  It was that brief (and not the

underlying data) upon which Commerce based its improper finding.  *First*

*Redetermination* at 45 and n. 106 (JA-6055).  Even if the analysis at **Figure 2** were

insufficient (given the unreliability of the underlying export data) to demonstrate <u>a</u>

lack of correlation, certainly a subset of those data (*i.e.*, that relied upon by

Commerce in the *First Redetermination*) also must be insufficient to demonstrate

an affirmative correlation.  Commerce has never provided any explanation for why

its finding of a correlation in the *First Redetermination* was supported by

substantial evidence, nor does Yihua make any argument that it was.  *Yihua Br.* at

21-22.  Commerce's finding of an affirmative correlation, therefore, was

unsupported by substantial evidence.[10]

    Even if there were substantial evidence of a some correlation (however

weak) between density and price (which there is not), it would not support

Commerce's finding that the weight-based data are superior to the volume-based

---

[10]    On this point, the Trade Court appears to have confused the parties in drafting the *Lifestyle II* opinion.  According to the Trade Court, "Commerce supported its finding that species densities correlate with price based on a broad list of hardwood lumber, whereas AFMC bases its statement to the contrary on a more limited list of lumber chosen from Yihua Timber's briefing at the agency level." *Lifestyle II,* 844 F. Supp. 2d at 1294 n. 23 (JA-47-48).  In fact, the opposite is true. Commerce supported its finding that species densities correlate with price based on a small subset of species hand-picked by Yihua, whereas AFMC demonstrated that, based on the complete list of species for which data were available, there is no correlation between density and price.  *See* AFMC's Comments Concerning Commerce's Final Results of Redetermination Pursuant To Remand (Oct. 6, 2011) at 18-22 (JA-6156-6160); AFMC's Reply Br. (Nov. 22, 2011) at 5-7 (JA-6179-6181).  Had the Trade Court not mistakenly swapped the positions of the parties, it presumably would have found no substantial evidence supporting any correlation between price and species density.  Regardless, this error was harmless, because the Trade Court correctly recognized that Commerce "made no findings as to the degree of the correlation or its impact on the surrogate value."  *Lifestyle II*, 844 F. Supp. 2d at 1294 n. 23 (JA-48).

data.  Assume for the sake of argument a positive correlation whereby a wood species that is twice as dense as another species carries a 10 percent price premium.  If the imports of wood into the Philippines are twice as dense as the wood consumed by Yihua, but the value is only 10 percent higher, the weight-based methodology remains highly distortive.  The slight increase in the numerator (value) would be more than offset by the huge increase in the denominator (kilograms), thereby artificially depressing the surrogate value.  Again, a weight-based approach would not be distorted by differences in species mix only when there is a perfect one-to-one correlation (*i.e.,* a correlation with a coefficient of 1.0) between price and density, such as where the density doubles, the price also doubles.  But even Yihua has admitted that "the correlation is not perfect."  Yihua Agency Br. (June 1, 2009) at 7 (JA-4532).  And the Trade Court correctly concluded that Commerce "made no findings as to the degree of the correlation or its impact on the surrogate value." *Lifestyle II*, 844 F. Supp. 2d at 1294  n. 23 (JA-47-48).

Finally, even if Commerce had found a perfect correlation between density and unit value (which it did not), a weight-based methodology still does not ameliorate the distortion caused by differences in moisture content.  Again, Yihua's consumption is comprised only of [          ] kilned wood, and Commerce acknowledges that at least some portion of the imports into the Philippines is

comprised of "green wood." Inevitably, therefore, moisture content must account for a large portion, if not all, of the density differential. Commerce's weight-based methodology is thus distortive and understates the surrogate value to the extent that the Philippine imports have a higher moisture content than Yihua's kiln-dried wood consumption.

Yihua argues that even if one cannot determine the impact of species mix, the Trade Court erred in weighing it against the distortion from moisture content. According to Yihua,

> The trial court acknowledged that species mix, just like moisture content, could have an effect on density and might distort the value of the wood in both weight and volume based calculations, *see Lifestyle II* at 1295, JA-48, but the trial court impermissibly weighed one variable low in favor of the other. Specifically, the trial court decided that the impact of species mix has a "variable and indeterminate" effect, and thus should not be considered, while high moisture content has a "definitive value-suppressing effect," which should be determinative. *Id.* at 1294-95, JA-49. The trial court's logic, *i.e.*, that for purposes of the accuracy of Commerce's antidumping margin calculation, it would matter if the moisture content of wood imports lowered the surrogate value, but would not matter if the presence of high-density, high-priced wood species raised the surrogate value, impermissibly prefers one inaccuracy over another. The trial court was wrong because the direction in which moisture content and species mix might affect the Philippine data, *i.e.*, overstate or understate, does not determine whether that effect should be considered. Both factors might have affected the density values in the Philippine data, and that effect exists regardless of whether a weight-based or volume-based surrogate value is selected. Thus, notwithstanding the trial court's re-weighing of the evidence, its reliance upon moisture content to

> overcome the effect of species mix was unsupported by
> substantial evidence and, therefore, unreasonable.

*Yihua Br.* at 21-22.

Yihua is wrong.  The weight-based approach is distorted to the extent that the density of the lumber imported into the Philippines differs from the density of the lumber consumed by Yihua.  That distortion persists whether the density differential is caused by differences in moisture content, species mix, or a combination of the two.  The Trade Court correctly observed that, to the extent the differential is a result of moisture content, there is "a definitive value-suppressing effect when weight-based data are used."  *Lifestyle II*, 844 F. Supp. 2d at 1294 (JA-46-48).  The Trade Court also correctly observed that, because Commerce failed to make certain findings regarding the correlation of density and price, differences in species mix may have "indeterminate effects" that cause distortion when weight-based data are used.  *Id*.  There was, however, nothing to "re-weigh" as argued by Yihua, because none of these potential sources of distortion demonstrated that a weight-based approach was superior to a volume-based approach.

The Trade Court stated that Commerce might  be able support the use of a weight-based approach if it reopened the record to make additional findings regarding the correlation of density to price and the impact of species mix on surrogate values.  *Lifestyle II*, 844 F. Supp. 2d at 1298 (stating that Commerce could "choose{} to reopen the record to gather more evidence" on the wood

valuation issue) (JA-53-54).  The Trade Court suggested that Commerce could collect "additional evidence showing … a clearer correlation between price and density" and showing that "the higher-value woods were a substantial import into the Philippines."  *Id*. at 1295 (JA-48-50).  Commerce, however, elected not to reopen the record on remand, *Second Redetermination* at 7 (JA-6342), and Yihua makes no argument that Commerce acted arbitrarily or otherwise abused its discretion in electing not to do so.  There is, therefore, no substantial evidence showing that the weight-based import data represent the "best available evidence" by which to value lumber.

### D.     Yihua Fails To Explain Why The *First Redetermination* Is Supported By Substantial Evidence When Commerce Never Addressed The Distortion Caused To Weight Data By The Inclusion Of Packaging Weights

For lumber, the NSO reports (and the WTA then republishes) weight data on a "gross weight" basis, which includes the weight of packaging materials.  *See* Post-Preliminary Results Surrogate Values Submission (March 6, 2009) at Attachment 1, Exhibits 2-3 (JA-3933-4126).  Surrogate values calculated on a weight basis may thus be understated for yet another reason: because the quantity in the denominator may include certain packing and container weights.  The Trade Court in *Lifestyle I* instructed Commerce to explain why use of a weight-based approach is not distortive given that "different types of packaging of the same

wood may result in distortions in the gross-weight data." *Lifestyle I*, 768 F. Supp.

2d at 1301 (JA-75).

The *First Redetermination* failed to address this concern by the Trade Court,

which subsequently concluded:

> Commerce seems to have conceded that packing
> materials are included in some of the data, because it
> agreed that it did "not have sufficient information on this
> record to conclude that packing does not generally
> account for the divergent differences in gross versus net
> weight data from the NSO . . .." *Remand Results* at 14.
> Thus, inclusion of packing materials may be one more
> reason why weight-based data should not be used.  At the
> very least it does not weigh against using volume-based
> data.

*Lifestyle II*, 844 F. Supp. 2d at 1295-96 (JA-50-51).

The inclusion of packing weights thus artificially depresses surrogate values

calculated using the weight-based approach.  *Id.*  Yihua, in its appeal to this Court,

makes no argument to the contrary.  Yihua does not argue that the weight-based

data are undistorted by the inclusion of packing materials.  Yihua also does not

argue that volume-based data are somehow distorted by this factor.  In this respect,

therefore, it is undisputed that the *First Redetermination* was unsupported by

substantial evidence.

### E.    Contrary To Yihua's Assertion, The Trade Court Did Not Improperly "Re-Weigh" The Evidence Of Distortion

Yihua argues that the Trade Court improperly "re-weighed" the evidence and "impermissibly prefers one inaccuracy over another." *Yihua Br.* at 22. Yihua's analysis is misguided.  Of the four potential sources of distortion discussed above (*i.e.,* the "standard conversion factor," moisture content, packaging weights, and species mix), the first has no impact, the next two necessarily depress surrogate values calculated using the weight-based data, and the last "has variable and indeterminate effects" that depend upon how prices correlate to density. *Lifestyle II,* 844 F. Supp. 2d at 1295 (JA-48).[11]  There was, therefore, nothing to "re-weigh," as the only evidence of distortion on the record affected the weight-based data.  Again, the Trade Court gave Commerce an opportunity to reopen the record to make additional findings regarding how prices correlate to density and

---

[11]    In the *First Redetermination*, Commerce stated that the volume-based data may be distorted by the "shrinkage" that occurs when green wood is dried. *First Redetermination* at 13 (JA-6023).  As the Trade Court correctly observed, however, this "does not constitute substantial evidence in support of the choice of weight-based data" because shrinkage only tends to understate surrogate values, and thus "it cannot be used as the basis for preferring a data set resulting in a greater undervaluation."  *Lifestyle II*, 844 F. Supp. 2d at 1294 n. 22 (JA-47).  *See also id.* at n. 27 (JA-52) AFMC's Comments Concerning Commerce's Final Results of Redetermination Pursuant To Remand (Oct. 6, 2011) at 23-25 (JA-6161-6163).  Yihua does not dispute the Trade Court's analysis in this appeal, and it makes no argument that Commerce's reliance on this factor in the *First Redetermination* to reject the volume-based data was supported by substantial evidence.

whether differences in species mix might distort the volume-based data more than the weight-based data, *Id.* at 1298 (JA-49), but Commerce declined to do so, *Second Redetermination* at 7 (JA-6342). Yihua makes no argument that Commerce acted arbitrarily or otherwise abused its discretion in not doing so.

Yihua argues that Commerce "reasonably decided between two flawed alternatives." *Yihua Br.* at 11. According to Yihua, when "Commerce is faced with a choice between two imperfect options, it is within Commerce's discretion to determine which choice represents the best available information." *Id.* at 18. Even where two choices are imperfect, however, one may be demonstrably more imperfect than the other (as is the case here). *See* **Figure 1**, above. As the Trade Court explained,

> There is no question that a distortive conversion ratio is being used in all cases if weight-based data are the metric chosen and any amount of green wood was imported under the relevant tariff headings, as Commerce concluded was the case. Speculation as to the impact of species mix and a widespread use of a standard conversion ratio from weight to volume are unsupported by the evidence. Commerce has yet to provide a single significant reason why the use of volume-based data does not resolve all or nearly all of the patent complications with the use of weight-based data. Given the above discussion, it seems clear that problems inherent in use of weight data necessarily result in an undervaluation, and any use of such data could only be justified if volume data were at least as distortive. The court finds Commerce has failed to support its rejection of a volume-based approach, and therefore, Commerce's decision to use WTA weight-based data in lieu of NSO volume-based data is not based on substantial evidence.

*Lifestyle II*, 844 F. Supp. 2d at 1297 (JA-52-53).  The Trade Court's analysis is sound, and Commerce provided no basis in the *First Redetermination* to conclude that the weight-based approach is superior to the volume-based approach or that weight-based data represent the "best available information" by which to value lumber.

### F.     Yihua Wrongly Suggests That The Trade Court Should Have Upheld Use Of WTA Weight Data To Provide "Consistency"

According to Yihua, "the trial court ignored Commerce's determination that relying upon the WTA data would provide parties with some consistency…. Consistency was an important basis for Commerce's determination, and the Court erred when it failed to acknowledge it." *Yihua Br.* at 25.  This argument is meritless.  Volume-based import data had been unavailable in prior reviews of the wooden bedroom furniture order.  When it became available in this review, Commerce was obligated under the statute to evaluate it and use it if such data represented the "best available information."  19 U.S.C. § 1677b(c)(1).  There is no legal principle requiring that Commerce, for the sake of "consistency," ignore new and potentially superior information as it becomes available.  Were it so, Commerce would be unable to improve its calculations and methodologies over time.

Moreover, it is wrong for Yihua to suggest that using weight-based data would somehow promote "consistency."  Since the volume-based data has been

available, Commerce has determined in every instance (the *Final Results* and *First Redetermination* in this case being the sole exceptions) that it is superior to the weight-based data for valuing lumber. The Trade Court did not "ignore" this factor as suggested by Yihua. To the contrary, the Trade Court cited the fact that Commerce – when confronted with this same choice between the NSO volume data and the WTA weight data – used the volume data in the subsequent fourth administrative review of this order. *See Lifestyle I*, 768 F. Supp. 2d at 1302 (JA-75-77). *See also Wooden Bedroom Furniture from the People's Republic of China*, 75 Fed. Reg. 5952, 5962 (Dep't of Commerce Feb. 5, 2010) (fourth review prelim. results). Commerce's decision to reject the NSO volume data in the final results of this case stands out as an aberration. To the extent there is a need to promote "consistency" with other instances where this issue has arisen, therefore, this Court should affirm the Trade Court and Commerce's use of the volume data in the *Second Redetermination*.

III. **THE TRADE COURT CORRECTLY UPHELD COMMERCE'S DECISION NOT TO VALUE LUMBER USING THE ALTERNATIVE SOURCES OF SURROGATE VALUES PROPOSED BY YIHUA**

A. **Yihua Waived Any Argument To Value Lumber Using Information Other Than Philippine Import Data**

Yihua argues that the Trade Court erred by not instructing Commerce that it could consider, during the second remand proceeding, sources by which to value lumber other than Philippine import data. *Yihua Br*. at 28. According to Yihua,

the remand instructions in *Lifestyle II* should have directed Commerce to consider

whether Philippine domestic prices or U.S. export prices represented the best

available information. *Id.* Instead, Yihua claims "the trial court directed

Commerce to ignore the contents of the administrative record." *Id.*

Yihua neglects to mention that, up until after the issuance of *Lifestyle II*, the

parties had been in agreement that Commerce must value lumber using either

volume-based import data or weight-based import data (as published by the NSO

or as republished by the WTA), and not some alternative data source. *Lifestyle III,*

865 F. Supp. 2d at 1293 (JA-25-27), citing *Lifestyle II*, 844 F. Supp. 2d at 1293 n.

16 (JA-44). There was no reason for the Court to instruct Commerce to consider

alternative sources, because no such sources had been proposed or briefed. Yihua

had, in fact, waived its arguments for the use of Philippine domestic prices or U.S.

export prices. *Lifestyle III*, 865 F. Supp. 2d at 1292-93 (JA-23-27).

Some background on this point is required. During the underlying

administrative review, Yihua argued that lumber should be valued using U.S.

export prices or Philippine domestic market prices in lieu of Philippine import

prices. *Yihua's Revised Agency Br*. (June 1, 2009) at 14-18 (JA-4539-4543).

Commerce rejected those arguments and calculated the surrogate values using

Philippine import data. *IDM* at 8-9 (JA-5237-5238). On appeal to the Trade

Court, Yihua filed a Complaint in which it challenged Commerce's decision to use

import data rather than domestic market prices.  Yihua's Complaint (Sep. 30, 2009) at Count IX (JA-5330).  Yihua later abandoned that claim by not including it in its Rule 56.2 Motion for Judgment on the Agency Record.  *See Yihua's Memorandum in Support of Plaintiff's Motion For Judgment On The Agency Record* (Feb. 26, 2010) (JA-5334-5336).  Yihua, moreover, waived any claim challenging Commerce's decision to use import data rather than U.S. export data by not including that claim in its Complaint.

Having abandoned its appeal of Commerce's decision not to value lumber using Philippine domestic prices, and having failed to appeal Commerce's decision not to value lumber using U.S. export data, Yihua could not raise those claims for the first time after the *Second Redetermination.  See, e.g., Home Prods. Int'l, Inc. v. United States*, 837 F. Supp. 2d 1294 (Ct. Int'l Trade 2012) ("Since Hardware abandoned this claim by not raising it in its complaint and opening brief"); *KYD, Inc. v. United States*, 836 F. Supp. 2d 1410, 1414 (Ct. Int'l Trade 2012), *aff'd,* 2013 WL 2321890 (Fed. Cir. May 29, 2013)  ("Plaintiff waives an argument which was not presented to the court until after it had filed its principal summary judgment brief"); *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) (a party waives an argument where it does not present the argument "until after it ha{s} filed its principal summary judgment brief . . . {because} parties must give a trial court a fair opportunity to rule on an issue . . . .").  The Trade Court

correctly determined, therefore, that Yihua was barred from raising these arguments for the first time after the *Second Redetermination*. *Lifestyle III*, 865 F. Supp. 2d at 1292-93 (JA-23-27).

Yihua contends that it was under no obligation to raise these alternative arguments until after the *Second Redetermination*. *Yihua Br*. at 30. According to Yihua, up until that point Commerce had been using WTA weight-based import data, "which was an acceptable surrogate value to Yihua." *Id*. Yihua argues that the issue of whether Commerce should use alternatives to Philippine import data did not ripen until Commerce began using volume-based import data, and Yihua raised its arguments as soon as they became ripe. *Id*.

Instead, however, the issues of (1) whether lumber should be valued using Philippine import data (or using some alternative data source) and (2) whether, if import data are used, units should be stated in cubic meters or kilograms, are entirely independent. Although Yihua prevailed during the underlying administrative review with regard to the second argument (convincing Commerce to use import data in the units preferred by Yihua), it did not succeed with respect to the first argument. Thus, Yihua was well aware that the issues were ripe for review from the beginning of its appeal, as evidenced by the fact that it included a claim in Count IX of its Complaint that challenged Commerce's rejection of domestic surrogate value data. (JA-5330). There is no reason why Yihua could

not have pursued the affirmative claims related to domestic pricing data and export value data in its own appeal while at the same time arguing (as defendant-intervenor in the AFMC's appeal) that, if import data are used, they should be stated on a weight (rather than volume) basis. *See Lifestyle III*, 865 F. Supp. 2d at 1293 (JA-27) ("whether Commerce should rely on HTS import data or domestic data is an entirely separate issue from the issue of whether Commerce should rely on weight-based or volume-based data").

Furthermore, although Yihua characterizes Commerce's use in the *Final Results* of import data stated on a weight basis as a "favorable result," it was [                                    ] relative to the domestic prices that Yihua argued for (and that Commerce rejected) in the administrative review proceeding.[12] Yihua had every opportunity to challenge Commerce's rejection of those domestic prices and to address the argument in its Rule 56.2 motion before the Trade Court, but it made a litigation decision not to do so. *See Lifestyle III*, 865 F. Supp. 2d at 1293 (JA-26-27) ("the domestic data for which Yihua Timber now argues were likely more favorable to the plaintiffs than WTA weight-based data. Thus, Yihua Timber

---

[12] The surrogate value for poplar and ash lumber used by Commerce in the *Final Results* using weight-based WTA import data was $[    ] per cubic meter. *See* **Figure 1** on page 19. This value was [                          ] than even the highest of the domestic prices proposed by Yihua, which ranged from $189.20 to $274.95 per cubic meter. Yihua's Revised Case Brief to Commerce (June 1, 2009) at pages 16-17 (JA-4541-4542). *See also Lifestyle III*, 865 F. Supp. 2d 1293 at n. 12 (JA-27).

did not receive a completely favorable result and its claim was ripe after the *Final Results*").  The Trade Court correctly found, therefore, that Yihua had abandoned its arguments for using alternative sources and could not resurrect such alternatives after the *Second Redetermination*.  As the Court explained,

> Yihua Timber did have an opportunity to raise this claim on a motion for summary judgment and chose not to do so there or before the court at any time before Commerce chose between the two data set options available to it.  By not preserving its claim for orderly consideration by the court, Yihua Timber has waived it…. After hours of oral argument and hundreds of pages of briefs, Yihua Timber cannot appear at the eleventh hour with a claim it set aside more than two years ago that was clearly related to an open issue.

*Lifestyle III*, 865 F. Supp. 2d at 1293 (JA-27).

### B.  Alternatively, Commerce's Finding On The Merits That The Philippine Import Data Are Superior To Yihua's Proposed Alternative Sources Is Supported By Substantial Evidence

Even if the Trade Court erred in finding that Yihua had waived this argument, such error was harmless.  Commerce addressed the merits of Yihua's proposed alternatives in its *Second Redetermination*, and it reasonably determined not to use those sources.  *Second Redetermination* at 11-12 (JA-6346-6347).

Commerce's findings in the *Second Redetermination* are supported by substantial evidence.  Yihua argues that the Philippine import data are inferior to the domestic pricing data and the U.S. export data, but Yihua fails to couch its arguments within the appropriate standard of review.  That is, Yihua argues the merits of its

alternative pricing data as if this Appeals Court were the initial finder of fact, and it fails to explain why Commerce's findings in the *Second Redetermination* are unsupported by substantial evidence. *Yihua Br.* at 31-40.

Yihua argues that the domestic pricing data are superior because they are "species-specific," whereas the import data reflect "basket categories." *Id.* at 33. As Commerce explained in both the original *Final Results* and in the *Second Redetermination*, however, it is the import data that are superior in terms of specificity. *See Second Redetermination* at 12 (JA-6347). The import data do reflect the correct <u>types</u> of lumber consumed by Yihua (*i.e.*, non-tropical species),[13] whereas the alternative domestic pricing data were only for tropical species that were not consumed by Yihua. The data provided by Yihua thus may have been "species-specific," but they were specific to the wrong inputs, and the import data used by Commerce were more specific to the actual types of wood consumed by Yihua. As the Trade Court explained, "the domestic data were comprised entirely of tropical lumber not used by Yihua Timber," and "tropical woods are simply not the same as poplar and ash." *Lifestyle III*, 865 F. Supp. 2d at 1294 (JA-27-28).

---

[13]    The Philippines disaggregates its import data for lumber among coniferous, tropical, and other. (JA-4073-75). Commerce valued Yihua's consumption of pine lumber using imports under the subheading for "coniferous," and it valued Yihua's consumption of poplar and ash lumber using imports under the subheading for "other." (JA-6074). Commerce did not use import data for tropical species, because Yihua did not consume any tropical species to make furniture. *Id.*

Although Yihua disagrees with that assessment, it fails to explain why Commerce's finding is unsupported by substantial evidence.

Yihua argues that the U.S. export pricing data are also superior to Philippine import data. *Yihua Br.* at 38-39. As Commerce explained in both the original *Final Results* and in the *Second Redetermination*, however, U.S. export prices could not be used because the United States is not a potential surrogate country, and, in any event, there is a preference not to use export data where, as here, reliable import data are available. *See Second Redetermination* at 11-12 (JA-6346-6347). Furthermore, the U.S. export statistics provided by Yihua were grossly incomplete and represented just a tiny fraction of the imports from the United States as reported by the Philippine NSO under the corresponding tariff categories. *See* AFMC's Agency Rebuttal Brief (June 4, 2009) at 18 (JA-4740). Once again, Yihua cannot demonstrate that Commerce's preference for Philippine import statistics is unsupported by substantial evidence.

## IV. THE TRADE COURT ABUSED ITS DISCRETION BY FAILING TO APPLY THE EXHAUSTION REQUIREMENT TO YIHUA'S ARGUMENT AGAINST THE USE OF DIRETSO'S FINANCIAL STATEMENTS

In the original *Final Results*, Commerce calculated the surrogate financial ratios (which were necessary for calculating Yihua's dumping margin) using the financial statements of Diretso Design, because it found that Diretso Design was a Philippine producer of "comparable merchandise" to the wooden bedroom

furniture manufactured by Yihua.  *IDM* at 43 (JA-5272).  This finding was based on "Diretso Design's online catalog," which had been submitted by both Yihua and the AFMC.  *Id.*, citing Yihua's Comments on Petitioners' Surrogate Value Submission of March 6, 2009 (Mar. 16, 2009) at Exhibit 1 (JA-4404-4462) and Petitioners' March 6, 2009 Post-Preliminary Results Surrogate Values Submission at Attachment 7 (JA-4252-4257).  The "online catalog" submitted by both parties was from the website www.diretso.com.  (JA-4404-4462 and JA-4252-4257).  In its agency briefing, Yihua argued that the www.diretso.com website showed that Diretso Designs made furniture from "abaca fibers," which it claimed was not "comparable merchandise."  Yihua's Agency Case Brief (June 1, 2009) at 33-35 (JA 4559).  Commerce, however, determined in the *Final Results* that the online catalog proved that Diretso Designs did, in fact, make comparable merchandise. *IDM* at 43 (JA-5272).

In its briefs filed with the Trade Court, Yihua fundamentally changed its argument.  Yihua claimed that there are two separate companies, "Diretso Design" and "Diretso Trading."   Yihua's Rule 56.2 Br. (Feb. 26, 2010) at 22-25 (JA-5364-5367).  According to Yihua, although the financial statements used in the surrogate ratio calculations were those of Diretso Design, the online catalog at www.diretso.com was, in fact, for "Diretso Trading," and thus did not support a finding that Diretso Design produced comparable merchandise.  *Id.*  This argument

should have been procedurally barred, because Yihua failed to exhaust its administrative remedies by not making this argument during the underlying administrative review. The Trade Court's finding to the contrary was based on a clear misreading of the administrative record and, consequently, the decision represented an abuse of discretion.

Yihua never argued during the underlying review that www.diretso.com related to "Diretso Trading" rather than "Diretso Design." In fact, it took the opposite position. During the underlying review, Yihua itself submitted printouts from www.diretso.com, which it represented as the official company website of Diretso Design. Yihua's Comments on Petitioners' Surrogate Value Submission of March 6, 2009 (Mar. 16, 2009) at 2 (JA-4399) ("In their March 6 submission, Petitioners provided information concerning two Philippine companies: Diretso Design Furnitures, Inc. and SCT Furnishing Corporation. In Exhibit 1, we provide Diretso product information from the company's website (www.diretso.com)"). *See also id*. at Exhibit 1 (JA-4404-4462). Moreover, in its agency case brief, Yihua continued to argue that this website pertains to Diretso Design. Yihua stated that "according to data on its own website… it is clear that Diretso Design specializes in the sale of chairs and tables made from abaca fibers, which is not comparable to wood furniture production." Yihua's Agency Case Brief (June 1, 2009) at 34 (JA-4559), citing excerpts of the www.diretso.com website at Exhibit 1

of its Comments on Petitioners' Surrogate Value Submission of March 6, 2009

(Mar. 16, 2009) (JA-4404-4462).  Similarly, Yihua stated that "Diretso Design's

website provides additional evidence that the company does not produce wooden

bedroom furniture."  *Id*. at 35 (JA-4560), citing the same www.diretso.com

excerpts (JA-4404-4462).  In other words, throughout the underlying review,

Yihua had taken the position that the online catalog appearing at www.diretso.com

related to Diretso Design.

In the *Final Results*, Commerce found that the online catalog at

www.dirtso.com showed that Diretso Design manufactured "comparable

merchandise" and thus is an appropriate surrogate producer.  *IDM* at 43 (JA-5272).

Commerce had no reason to address in its *Final Results* the argument that the

www.dirtso.com website related to some other company like "Diretso Trading,"

because no party ever presented such an argument.  Nevertheless, the Trade Court

opined that Yihua had preserved this issue in its agency case brief.  According to

the Court,

> Yihua Timber's contention before Commerce was that
> the evidence, "is not a description of Diretso Design, but
> rather, of Diretso Trading (perhaps a Sister Company)."
> *See* Def.'s App. Doc. 559, at 34.  Commerce did not
> respond to this comment in the Final Results and
> therefore does not provide substantial evidence to support
> its use of Diretso Design.  *See* Issues and Decision
> Memorandum at 43.

*Lifestyle I*, 768 F. Supp. 2d at 1308 (JA-87-89).[14]

The Trade Court's analysis is based upon a clear misunderstanding. The quotation from page 34 of Yihua's agency case brief had not challenged the fact that the www.dirtso.com website related to Diretso Design. Rather, it challenged whether entirely unrelated information on third-party website www.alibaba.com related to Diretso Design. Yihua's Agency Case Brief (June 1, 2009) at 33-34 (JA-4558-4559). Yihua's agency brief contested "the information that Petitioners have put on the record that purports to describe Diretso Design's operations." *Id.* According to Yihua,

> That information refers to a factory of 10,000-30,000 square meters, over 500 employees, annual sales of between US $2.5 and US$ 5 million, over 80 percent of which are to export markets and various collections of bamboo-teak furniture. *This is not a description of Diretso Design, but rather, of Diretso Trading (perhaps a sister company).*

*Id.* at 34 (emphasis in original) (JA-4559). The cited information challenged by Yihua appeared exclusively on the website www.alibaba.com. Petitioners' Supp. Submission of Surrogate Values (Dec. 30, 2008) at Attachment 7, page 2 (JA-1135). That information was not taken from the www.diretso.com website, and

---

[14]    In *Lifestyle I*, the Trade Court found that the information at www.diretso.com "constitute{d} substantial evidence that the company described therein produces comparable merchandise to respondent." *Lifestyle I*, 768 F. Supp. 2d at 1308 (JA-88-89). The Court remanded, however, "so that Commerce may determine if the financial statements match the correct company." *Id.*

Yihua had never claimed that the online product catalog did not relate to Diretso Design.

In its *Final Results*, Commerce did not rely on any information from the www.alibaba.com website to show that Diretso Design produced comparable merchandise. Instead, Commerce premised its finding that Diretso Design manufactures "comparable products" on the online catalog from the www.diretso.com website. *IDM* at 43 (JA-5272) Whether the information at www.alibaba.com relates to "Diretso Design" or "Diretso Trading" is thus immaterial to this appeal.

Nowhere in Yihua's agency case brief did Yihua suggest that the website www.diretso.com does not relate to Diretso Design. *See* Yihua's Agency Case Brief (June 1, 2009) at 33-35 (JA-4558-4560). Because the issue was not in dispute, there was no reason for the Department to address it in the *Final Results*. The AFMC explained why the Trade Court should have barred Yihua's fundamentally new argument on appeal. AFMC's Rule 56.2 Rebuttal Br. (June 4, 2010) at 14-15 (JA-5492-5493). The Trade Court's misreading of the record, however, led to its incorrect conclusion that Yihua had exhausted its administrative remedies. Yihua had not done so, and the Trade Court should have affirmed Commerce's reliance on the financial statements of Diretso Design.

The law requires that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). In cases where a party has failed to raise an issue below, the Trade Court has discretion as to whether it is "appropriate" to apply the doctrine, and such decisions are reviewed under an abuse of discretion standard. *See Corus Staal*, 502 F.3d at 1381. In this case, however, because the Trade Court erred in finding that Yihua had raised this issue before the agency, it never reached the critical issue of whether, in light of Yihua's failure to preserve this issue, it was appropriate to require the exhaustion of remedies per 28 U.S.C. § 2637(d).[15] In this respect, the Trade Court's decision was erroneous and represents an abuse of discretion. As Yihua acknowledges, the Trade Court "abuses its discretion when it … exercises its judgment on clearly erroneous findings of material fact." *Yihua Br.* at 11, citing *Chiu,* 948 F.2d at 713. At the very least, therefore, a remand is required so that the Trade Court may exercise its discretion to determine whether there is any exception that would justify not requiring the exhaustion of administrative remedies per 28 U.S.C. § 2637(d).

---

[15]    No party has claimed that an exception to the exhaustion doctrine applies in this case. There would have been no basis, therefore, for the Trade Court not to require the exhaustion of remedies per 28 U.S.C. § 2637(d).

## V.     THE TRADE COURT ERRED WHEN FINDING THAT COMMERCE'S DECISION NOT TO USE DIRETSO'S FINANCIAL STATEMENTS IN THE *FIRST REDETERMINATION* WAS SUPPORTED BY SUBSTANTIAL EVIDENCE

Even if the Trade Court did not abuse its discretion in remanding the matter,

it erred in upholding Commerce's decision in the *First Redetermination* to

discontinue using Diretso Design's financial statements.  Commerce's finding that

www.diretso.com related to Diretso Trading rather than Diretso Design, *First*

*Redetermination* at 17-18 (JA-6027-6028), is unsupported by substantial evidence.

The record conclusively demonstrates that the financial statements of Diretso

Design (as used by Commerce for the surrogate financial ratio calculations in the

*Final Results*) are for the same company that is described in the website at

www.diretso.com.  This evidence includes the following:

- The audited financial statements of Diretso Design state that the official company website appears at www.diretso.com.  Petitioners' Supplemental Submission of Surrogate Factor Values (Dec. 30, 2008) at Attachment 4, page 3.  (JA-1054).

- The audited financial statements of Diretso Design provide the official corporate address, telephone number, fax number, and email address for the company.  *Id.*  The "contact us" page at www.diretso.com lists the *identical* address, telephone number, fax number, and email address.  Request for Comment Regarding New Factual Information at Attachment 1, page 9 (March 30, 2011) (JA-5607).

- The audited financial statements of Diretso Design state that the company's furniture manufacturing plant is located in the "City of San Fernando, Pampanga."  Petitioners' Supplemental Submission of Surrogate Factor Values (Dec. 30, 2008) at Attachment 4, page 14, n. 1 (JA-1065).  The website at www.diretso.com similarly states that

the company has one manufacturing plant which is located "in the City of San Fernando in Pampanga, Philippines." Petitioners' Post-Preliminary Results Surrogate Values Submission (March 6, 2009) at Attachment 7, page 1 (JA-4252).

- The financial statements of Diretso Design bear a distinctive company logo (a large unique font stating "Diretso," beneath which appears a much smaller font stating "Manufacturer of Quality Furniture"). Petitioners' Supplemental Submission of Surrogate Factor Values (Dec. 30, 2008) at Attachment 4, page 3 (JA-1054). The identical logo appears in the "contact us" page at www.diretso.com. Request for Comment Regarding New Factual Information (March 30, 2011) at Attachment 1, page 9 (JA-5607). In addition, the same logo appears within the product catalogs available through that website (as previously submitted by both the AFMC and Yihua). *See* Petitioners' Post-Preliminary Results Surrogate Values Submission (Mar. 6, 2009) at Attachment 7 (JA-4253); Yihua's Comments on Petitioners' Surrogate Value Submission of March 6, 2009 (March 16, 2009) at page 2 and Exhibit 1 (JA-4399 and 4403-4462).

In the *First Redetermination*, Commerce did not dispute these clear connections between the audited financial statements and the www.diretso.com website. *First Redetermination* at 17 (JA-6027). Commerce stated, however, that these connections were undermined by two third-party websites. *Id*. at 18 (JA-6028). In particular, Commerce noted that one third-party website reported that the domain www.diretso.com is registered to Diretso Trading, and another third-party website "disputes Diretso Design's physical address." *Id*. *See also Draft Redetermination* (June 1, 2011) at 15 (JA-5678).

The AFMC had filed comments regarding these findings from the *Draft Redetermination*. *See* Petitioners' Comments Concerning Draft Results Of

Redetermination (June 13, 2011). As explained in those comments, the referenced third-party websites do not undermine the fact that www.diretso.com matches the audited financial statements of Diretso Design. *Id*. at 19-24 (JA-5719-5724). In particular, the AFMC explained that Diretso Trading is a separately incorporated entity that has a limited role in "supervisory" and "communications" activities but that does not engage in manufacturing activity (and is precluded by its Philippines charter from doing so). *Id*., citing AFMC's Submission of Rebuttal Factual Information (April 8, 2011) at Exhibit, pages 3, 8, 10 (JA-5656, 5661 and 5663). The AFMC explained that, regardless of the nature of any affiliation between Diretso Trading and Diretso Design, the merchandise listed at www.diretso.com must relate to Diretso Design because Diretso Trading has no manufacturing capabilities. *Id*. The AFMC additionally explained that this is confirmed by the fact that www.diretso.com lists only a single manufacturing plant, and it provides the same location for that plant as the one listed in the financial statements of Diretso Design. *Id*. at 21. Commerce failed to address any of these points, let alone rebut them, in its *Final Redetermination*. *First Redetermination* at 17-18, 49-50 (JA-6027-6028, 6059-6060).

The AFMC also explained that third-party websites do not "dispute" the information contained in Diretso Design's audited financial statements. Petitioners' Comments Concerning Draft Results Of Redetermination (June 13,

2011) at 22-23 (JA-5722-5723) ("No reasonable fact-finder would conclude that, because some third-party website lists a different address than the one on Diretso Design's audited financial statements, the financial statements must be unreliable or inaccurate").  Indeed, Commerce has made clear in previous cases that information listed "on a third-party website in no way calls into question the credibility of these audited financial statements."  *Persulfates from the People's Republic of China*, 68 Fed. Reg. 68030 (Dep't of Commerce Dec. 5, 2003) (final results) at Comment 4.  Commerce again failed to rebut this point in its Final Redetermination.  *First Redetermination* at 17-18, 49-50 (JA-6027-6028 and 6059-6060).

In the comments section of its *Final Redetermination*, Commerce made no attempt to explain why the AFMC's arguments did not undermine its evaluation of the evidence.  To the contrary, Commerce acknowledged "that it is the Department's practice not to rely on third-party websites to call into question the credibility of audited financial statements."  *First Redetermination* at 50 (JA-6060).  Commerce, however, made a new factual finding in the *Final Redetermination* to justify its decision on alternative grounds.  *Id*.  According to Commerce,

> while certain details between the financial statements and the website overlap (*i.e.* address, logo, principal activity), we find that the sales figures in Diretso Design's financial statements do not support the website's

contention that it has sales in 37 overseas markets. Specifically, Diretso Design only had 13,771,812.71 Philippine pesos (approximately 296,000 USD) of sales during this period, which does not comport with a company with a large sales base as depicted on the www.diretso.com website. Because we remain uncertain whether this website belongs to Diretso Design, we are continuing to exclude Diretso Design's financial statements from our surrogate financial ratio calculations….

*First Redetermination* at 50 (JA-6060).

Commerce's decision to reject the financial statements of Diretso Design in the *First Redetermination*, therefore, appears to be premised on this one new "finding" regarding a supposed inconsistency between the financial statements and the website with respect to the number of overseas markets served by the company. This finding, however, results from a clear misunderstanding of the record evidence. There is, in fact, no inconsistency between www.diretso.com and the financial statements. It is correct that the financial statements report sales income of 13,771,812 Philippine pesos (approximately 296,000 USD) during 2007. Petitioners' Supplemental Submission of Surrogate Factor Values (Dec. 30, 2008) at Attachment 4 (JA-1051-1086). The website, however, makes no claim of "sales in 37 overseas markets… *during this {same 2007} period*." *First Redetermination* at 50 (JA-6060) (emphasis added). In fact, the website as it was available during the underlying review provided no information regarding the number of overseas markets. *See* Petitioners' Post-Preliminary Results Surrogate Values Submission

(March 6, 2009) at Attachment 7 (JA-4251-4256).  The reference to "37 overseas markets" appeared for the first time on the website as it was downloaded on March 28, 2011 and placed on the record by Commerce.  Request for Comment Regarding New Factual Information (March 30, 2011) at Attachment 1, page 4 (JA-5602).  Moreover, the website as downloaded in 2011 states: "*Since our inception*, we are proud of the fact that, with sales into 37 overseas markets, we have built in-depth expertise…" *Id.* (emphasis added).  Because the company was founded in 1996, *id.* at 3 (JA-5601), the claim regarding sales into 37 markets clearly encompasses the *entire 15 year history of the company from 1996 to 2011*, not just the 2007 time period covered by the relevant financial statements (as Commerce mistakenly believed).  There is, in fact, no inconsistency between Diretso Design's reported sales values for 2007 and the website's claim that the company sold into 37 overseas markets over the last 15 years.  Commerce overlooked this point and provided no reasonable explanation for how these statements are at odds.

Under the substantial evidence standard, "a reviewing court must consider the record as a whole, including that which fairly detracts from its weight, to determine whether there exists such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nippon Steel Corp. v. U.S.*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (internal quotation marks omitted).  Even if there were

an "inconsistency" as identified by Commerce, no reasonable finder of fact could conclude – in light of all of the other above mentioned compelling record evidence to the contrary (*e.g.,* the fact that the financial statements of Diretso Design explicitly refer to the company's website at www.diretso.com, the fact that both the financial statements and the website list the same corporate address and manufacturing facility) – that the website does not relate to Diretso Design.  The "inconsistency" identified by Commerce with regard to the number of export markets served by Diretso Design is, at best, tenuous and irrelevant, and it does nothing to undermine the conclusive evidence that www.diretso.com relates to Diretso Design.  Commerce's finding in the *First Redetermination*, therefore, is unsupported by substantial evidence.

## CONCLUSION

For the reasons set forth above, this Court should affirm Commerce's valuation of lumber inputs in the *Second Redetermination*, but it should remand for Commerce to recalculate the surrogate financial ratios using the financial statements of Diretso Design.

Respectfully submitted,

*/s/ J. Michael Taylor*
Joseph W. Dorn
J. Michael Taylor
Daniel L. Schneiderman

August 5, 2013                    Counsel for Defendants-Cross Appellants

**LIFESTYLE ENTERPRISE, INC. V. UNITED STATES**                **Public**
**CAFC Appeal No. 2013-1323, -1331**

## CERTIFICATE OF SERVICE

This is to certify that on this 5th of August 2013, I have caused the foregoing **NON-CONFIDENTIAL BRIEF OF DEFENDANTS-CROSS APPELLANTS** to be served upon the following parties via the method indicated below:

**VIA CM/ECF:**

Kristin Heim Mowry
**Mowry & Grimson, PLLC**
Suite 810
5335 Wisconsin Avenue, N.W.
Washington, DC 20015
khm@mowrygrimson.com

John D. Greenwald
**Cassidy Levy Kent (USA) LLP**
2000 Pennsylvania Avenue, NW
Suite 3000
Washington, DC 20006
jgreenwald@cassidylevy.com

Shana Hofstetter
**U.S. Department of Commerce**
1401 Constitution Avenue, NW
Room 4610
Washington, DC 20230
Shana.Hofstetter@trade.gov

Stephen Carl Tosini, Trial Attorney
**Department of Justice**
Commercial Litigation Branch,
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20530
stephen.tosini@usdoj.gov

*/s/ J. Michael Taylor*
J. Michael Taylor
**KING & SPALDING LLP**
1700 Pennsylvania Ave., N.W.
Washington, D.C.  20006
(202) 737-0500

15642107

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE
## REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 28.1(e)(2)(B)(i). Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B)(iii), this brief includes 13,882 words.

This brief has been prepared in Microsoft Office Word 2010 using a proportionally spaced typeface (14 point Times New Roman font).  In preparing this certificate, the undersigned has relied upon the word count feature of this word-processing system as permitted by Fed. R. App. P. 32(a)(7)(C)(i)

*/s/ J. Michael Taylor*
Joseph W. Dorn
J. Michael Taylor
Daniel L. Schneiderman
KING & SPALDING LLP

Counsel for Defendants-Cross Appellants
American Furniture Manufacturers
Committee for Legal Trade and Vaughan-
Bassett Furniture Company, Inc.

Dated: August 5, 2013

21372608